Westlaw.

Slip Copy, 2010 WL 5538515 (S.D.Ga.)
**(Cite as: 2010 WL 5538515 (S.D.Ga.))**

▷
Only the Westlaw citation is currently available.

United States District Court,
S.D. Georgia,
Savannah Division.
Rondy C. BACON, Plaintiff,
v.
GEORGIA PORTS AUTHORITY, Defendant.

No. CV410-281.
Dec. 17, 2010.

Rondy C. Bacon, Midway, GA, pro se.

### *REPORT AND RECOMMENDATION*

GEORGE R. SMITH, United States Magistrate
Judge.

*\*1* Plaintiff Rondy C. Bacon brings this Title
VII case against the Georgia Ports Authority,[FN1]
alleging that he was fired on a false sexual harass-
ment charge and, because he is black, this consti-
tutes race discrimination in violation of Title VII.
[FN2] Doc. 1 at 3-4. He seeks leave to proceed *in
forma pauperis.* Doc. 2. He also moves the Court to
appoint him an attorney. *Id.*

> FN1. He named it "Georgia Port Author-
> ity," doc. 1 at 1, but its correct name is the
> "Georgia Ports Authority." The above cap-
> tion has been amended. All subsequent fil-
> ings shall confirm.

> FN2. Title VII of the 1964 Civil Rights
> Act makes it unlawful for an employer to
> "fail or refuse to hire or to discharge any
> individual, or otherwise to discriminate
> against any individual with respect to his
> compensation, terms, conditions, or priv-
> ileges of employment, because of such in-
> dividual's race, color, religion, sex, or na-
> tional origin." 42 U.S.C. § 2000e-2(a)(1).

The Court **GRANTS** his IFP motion (doc. 2),
but **DENIES** his motion for appointment of counsel
because his case is so meritless that it must be **DIS-
MISSED WITH PREJUDICE** under 28 U.S.C. §
1915(e)(2)(B).[FN3] Bacon seems to believe that
merely being black and suffering an adverse em-
ployment action (like being fired) supports a race-
discrimination Title VII claim. Doc. 1 at 3-4; *see
also* doc. 2 at 2. But Title VII requires, at a minim-
um, unlawful *race*-based discrimination. Hence,
there must be direct evidence that Bacon's race
played a role in his discharge, or circumstantial
evidence that a comparable, non-minority employee
received materially better treatment than him.

> FN3. "Where a plaintiff is proceeding in
> forma pauperis, a district court is required
> to sua sponte determine whether the com-
> plaint: (1) is frivolous or malicious; (2)
> fails to state a claim upon which relief may
> be granted; or (3) seeks monetary relief
> against a defendant who is immune from
> such relief. 28 U.S.C. § 1915(e)(2) (B);
> *See Alba v. Montford,* 517 F.3d 1249,
> 1251-52, n. 3 (11th Cir.), *cert. denied,* ---
> U.S. ----, 129 S.Ct. 632, 172 L.Ed.2d 619
> (2008)." *Walker v. Sun Trust Bank Of
> Thomasville, GA,* 2010 WL 165131 * 4
> (11th Cir. Jan.19, 2010).

That means that Bacon-even under the more re-
laxed pleading standard afforded *pro se* litigants,
*Federal Exp. Corp. v. Holowecki,* 552 U.S. 389,
402, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008)-must at
least allege either direct evidence (e.g., manage-
ment's express explanation that "we're firing you
because we don't want blacks working for us") or
circumstantial evidence (that a non-minority was
treated better than him). *See Knight v. Baptist
Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316-19 (11th
Cir.2003); *Marshall v. Mayor and Alderman of City
of Savannah, Ga.,* 366 F. App'x 91, 97 (11th
Cir.2010); *Brown v. Jacobs Engineering, Inc.,* 2010
WL 4244116 at *1 (11th Cir. Oct.28, 2010). Bacon
has failed to do that.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5538515 (S.D.Ga.)
**(Cite as: 2010 WL 5538515 (S.D.Ga.))**

There was a time when it was not necessary for plaintiffs like Bacon to plead sufficient facts establishing all of the Title VII elements. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("we hold that an employment discrimination plaintiff need not plead a prima facie case of discrimination ... to survive respondent's motion to dismiss."); *Davis v. Coca-Cola Bottling Co. Consol.,* 516 F.3d 955, 974 (11th Cir.2008) ("a Title VII complaint need not allege facts sufficient to make a classic ... prima facie case"). However, the new Fed.R.Civ.P. 8 and 12 pleading standards set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), changed that. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3rd Cir.2009) (under those new pleading standards, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts.") (quotes and cite omitted). Bacon thus must allege sufficient facts that, if accepted as true, state a claim to relief that is plausible on its *face.* He thus must plead enough here to allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,* 129 S.Ct. at 1949, which here means violating Title VII. Determining whether his complaint is "facially plausible" is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* at 1950. So where the well-pleaded facts do not permit the court to infer more than the *mere possibility* of misconduct, then the complaint has alleged-but not shown-that the pleader is entitled to relief. *Id.*

**\*2** "These [*Twombly/Iqbal*-based] general pleading standards are equally applicable to employment discrimination cases." *Adams v. Lafayette College,* 2009 WL 2777312 at \*3 (E.D.Pa. Aug.31, 2009) (citing *Fowler,* 578 F.3d at 211). Under these new standards, this Court accepts as true Bacon's factual allegations but not his legal conclusions. *Iqbal,* 129 S.Ct. at 1950. It then determines if his

alleged facts are sufficient to state a plausible claim for relief. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1949-50.

Again, Bacon alleges neither direct-evidence facts ("because you're black") nor circumstantial-evidence facts (comparable white treated better). His complaint therefore is dead on arrival. *Cf. Parker v. Smyrna Police Dept.,* 2010 WL 4540286 at \* 2 (N.D.Ga. Oct.29, 2010) (applying *Iqbal* in sua sponte dismissing civil rights complaint based on equal protection claim, where plaintiff failed to allege any fact suggesting that he was treated differently based on a constitutionally protected interest such as race, nor has he alleged facts sufficient to move a possible class-of-one equal protection claim across the line from conceivable to plausible) (quotes and cites omitted); *Williams v. Temple University Hosp., Dist. Council 1199C,* 2010 WL 4540328 at \* 2 (11th Cir. Nov. 12, 2010) (employment disability discrimination case dismissed- for failing to plead material element of claim; it did not plausibly identify an impairment, allege a limitation, or otherwise indicate how plaintiff might be substantially limited in a major life activity, but merely stated that she was injured at work and was later "sent back to work" on "full duty status.").

Bacon's case should therefore be **DISMISSED WITH PREJUDICE** under 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), as it bears not even the slightest hint that it can be cured with a "second-chance" amendment.[FN4] *Cf. Langlois v. Traveler's Ins. Co.,* 2010 WL 4146153 at \* 1-2 (11th Cir. Oct.22, 2010) (even though IFP's litigant's pro se complaint failed to state basis for federal jurisdiction and failed to state a claim, and she failed to seek leave to amend her complaint, nevertheless she should have been afforded an opportunity to amend deficiencies prior to dismissal, where

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5538515 (S.D.Ga.)
**(Cite as: 2010 WL 5538515 (S.D.Ga.))**

fewer than 21 days had passed since she had filed her complaint, defendants had not yet been served, no responsive pleadings had been filed, there was no risk of undue prejudice, there was no evidence of plaintiff's undue delay, bad faith, or dilatory motive, and amendment would not have been futile given additional documentary evidence attached to her appellate brief, which, although not properly before court, suggested that there might have been additional information that she could have provided in her original complaint).

> FN4. In light of this result, it is not necessary for the Court to reach the issue whether the defendant would be otherwise immune from suit under the Eleventh Amendment. *See Peery v. Serenity Behavioral Health Systems,* 2009 WL 1228446 at * 5 (S.D.Ga. May 4, 2009) (citing conflicting precedent on this point); *Misener Marine Const., Inc. v. Norfolk Dredging Co.,* 2008 WL 2278132 at * 8 (S.D.Ga. Mar.28, 2008) (holding that the Georgia Ports Authority is entitled to Eleventh Amendment Immunity).

**\*3 SO REPORTED AND RECOMMENDED.**

S.D.Ga.,2010.
Bacon v. Georgia Ports Authority
Slip Copy, 2010 WL 5538515 (S.D.Ga.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2011 WL 43504 (S.D.Ga.)
**(Cite as: 2011 WL 43504 (S.D.Ga.))**

**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. Georgia,
Savannah Division.
Rondy C. BACON, Plaintiff,
v.
GEORGIA PORTS AUTHORITY, Defendant.

No. CV410-281.
Jan. 6, 2011.

Rondy C. Bacon, Midway, GA, pro se.

### ORDER
WILLIAM T. MOORE, JR., District Judge.

*1 Before the Court is the Magistrate Judge's Report and Recommendation (Doc. 3), to which objections have been filed (Doc. 6). After a careful de novo review of the record, the Court finds Plaintiff's objections to be without merit. Accordingly, the report and recommendation is **ADOPTED** as the Court's opinion in this case with the following modification: Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED.

S.D.Ga.,2011.
Bacon v. Georgia Ports Authority
Slip Copy, 2011 WL 43504 (S.D.Ga.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 2986405 (S.D.Ga.)
**(Cite as: 2007 WL 2986405 (S.D.Ga.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Georgia,
Waycross Division.
Joe Curtis HARRIS, Plaintiff,
v.
Michael HALL, Food Service Manager, Defendant.

Civil Action No. CV506-068.
Oct. 9, 2007.

Joe Curtis Harris, Oglethorpe, GA, pro se.

Christopher L. Ray, Connell C. Youmans, Oliver, Maner & Gray, LLP, Savannah, GA, Gregory D. Cote, McCarter & English, LLP, Boston, MA, for Defendant.

***ORDER***
LISA GODBEY WOOD, United States District Judge.

**\*1** After an independent review of the record, the Court concurs with the recommendation of the Magistrate Judge that Defendant's Motion for Summary Judgment be granted. Based upon the undisputed evidence submitted by both parties, the Magistrate Judge determined that Plaintiff has failed to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Based upon that failure, the Magistrate Judge recommended that summary judgment be entered in Defendant's favor. Plaintiff has filed Objections to the Report and Recommendation, wherein he reasserts the factual allegations of his Complaint and appears to contend that he should not be required to exhaust his administrative remedies. Plaintiff also appears to allege that the PLRA's exhaustion requirement is unconstitutional. Defendant has filed a Reply to the Objection.

First, Plaintiff's apparent contention that the PLRA's exhaustion requirement somehow violates his First Amendment right of access to the courts is without merit. The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const. Amend. I. Under this Amendment, prisoners do enjoy a constitutional right to "adequate, effective and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). However, 42 U.S.C. § 1997e(a) does not render Plaintiff's right to access inadequate or ineffective. As the Eleventh Circuit has noted, "the right of access to federal courts is not a free-floating right, but rather is subject to Congress's Article III power to set limits on federal legislation." *Rivera v. Allin,* 144 F.3d 719, 723 (11th Cir.1998) (citation and internal punctuation omitted). The exhaustion requirement created by Congress does not *prevent* the inmate from accessing the court, but instead merely creates a condition precedent to his filing suit. Where an inmate's complaint is dismissed for failure to comply with § 1997e(a), he is free to properly exhaust his administrative remedies and file again after doing so.

As the Magistrate Judge noted, under 42 U.S.C. § 1997e(a), the exhaustion of available administrative remedies is a *mandatory* prerequisite to filing suit. *See Porter v. Nussle,* 534 U.S. 516, 523, 122 S.Ct. 983, 987, 152 L.Ed.2d 12 (2002). There is no futility exception, *Woodford v. Ngo,* ---U.S. ----, 126 S.Ct. 2378, 2382, 165 L Ed.2d 368 (2006), and "an inmate's subjective belief that the procedures were not applicable to [particular] grievances does not matter and is not determinative," *Priester v. Rich,* 457 F.Supp.2d 1369, 1373 (S.D.Ga.2006) (citations omitted). The evidence submitted on Defendant's summary judgment motion establishes that Plaintiff failed to complete the Georgia Department of Corrections' three-step grievance procedure for his claim. Plaintiff's Objections offer nothing to refute Defendant's evidence on this point, and ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2986405 (S.D.Ga.)
(Cite as: 2007 WL 2986405 (S.D.Ga.))

cordingly his Complaint is due to be dismissed. Defendant's Motion for Summary Judgment (Doc. No. 25) is hereby **GRANTED.** Plaintiff's Complaint is **DISMISSED,** without prejudice, as Plaintiff did not exhaust his administrative remedies prior to filing his complaint. The Clerk of Court is authorized and directed to enter the appropriate Judgment of Dismissal.

**\*2 SO ORDERED.**

### MAGISTRATE JUDGE'S REPORT AND RE-COMMENDATION

JAMES E. GRAHAM, United States Magistrate Judge.

Plaintiff, an inmate currently incarcerated at Macon State Prison in Oglethorpe, Georgia, has filed an action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement while at D, Ray James Prison in Folkston, Georgia. Defendant Michael Hail filed a Motion to Dismiss or in the Alternative for Summary Judgment (Doc. No. 25), which the Court construes as a Motion for Summary Judgment [FN1], and Plaintiff filed a Response (Doc. No. 33). For the reasons which follow, Defendant's Motion should be **GRANTED.**

> FN1. If "matters outside the pleading are presented to and not excluded by the court", the "motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." FED.R.CIV.P. 12(b).

### STATEMENT OF THE CASE

Plaintiff asserts that Defendant, as Food Service Manager at D. Ray James Prison, is responsible for his having to consume non-Kosher, non-nutritional, and contaminated foods. Plaintiff alleges that Defendant has violated both his First and Eighth Amendment rights.

In his Motion, Defendant contends that: (1) Plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (2) Plaintiffs claims for money damages are not based on a physical injury as required by the PLRA; (3) Defendant is not subject to damages in his official capacity under § 1983; (4) Plaintiff's claim for injunctive relief against Defendant in his official capacity is "misdirected"; (5) Defendant lacks the authority to remedy Plaintiff's religious diet claim; (6) the meals served at D. Ray James Prison satisfy Plaintiff's religious dietary restrictions; (7) Plaintiff fails to satisfy either the objective or subjective prong of his Eighth Amendment claim; (8) no basis exists to award punitive damages to Plaintiff; and (9) Defendant is entitled to qualified immunity.

### STANDARD OF DETERMINATION

Summary judgment should be granted only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The procedure for disposing of a summary judgment motion is well established. The Court may grant summary judgment to a party when the evidence demonstrates that the nonmoving party has failed to establish an essential element of his case. The party moving for summary judgment bears the initial burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In applying this standard, a court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion. All reasonable doubts regarding the facts should be resolved in favor of the nonmovant. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

Once the moving party has met this initial burden, the burden shifts to the opposing party to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrell,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The opposing party may not simply rest upon mere allegations or denials of the pleadings. Rather, the nonmoving party must make a sufficient showing of facts to establish the existence of an essential element to his case on which he will bear the burden of proof at trial. *Id .; Barfield v. Brierton,* 883 F.2d 923, 933 (11th

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2986405 (S.D.Ga.)
**(Cite as: 2007 WL 2986405 (S.D.Ga.))**

Cir.1989). To oppose the motion sufficiently after the movant has met his initial burden, the nonmoving party must point to evidence in the record or present additional evidence in the form of affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure. *Riley v. Newton,* 94 F.3d 632, 639 (11th Cir.1996). If the record presents factual issues, the Court must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir.1999). Summary judgment is also inappropriate where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Id.*

### DISCUSSION AND CITATION OF AUTHORITY

**\*3** Federal prisoners seeking relief under § 1983 must first exhaust inmate grievance procedures before filing suit in federal court. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). 42 U.S.C. § 1997e(a) states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law ... until such administrative remedies as are available are exhausted." In *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the United States Supreme Court held that exhaustion of available administrative remedies is mandatory. *Porter* at 523, 122 S.Ct. at 987. Thus, even when the prisoner is seeking relief not provided for under the grievance process, exhaustion is still a prerequisite to his filing suit. *Id.* at 524, 122 S.Ct. at 988; *Booth v. Churner,* 532 U.S. 731,732, 121 S.Ct. 1819, 1821, 149 L.Ed.2d 958 (2001). It is not the role of the court to consider the adequacy or futility of the administrative remedies afforded to the inmate. *Higginbottom v. Carter,* 223 F.3d 1259, 1261 (11th Cir.2000). The court's focus should be on what remedies are available and whether the inmate pursued these remedies prior to filing suit. *Id.*

Defendant submits the Georgia Department of Corrections ("GDC") Standard Operating Proced-

ures, which detail the GDC's administrative grievance system. FN2 (Doc. No. 27-1, pp. 5-25). Defendant also submits the affidavit of Michelle Howell, Chief Counselor at D. Ray James Prison and the person in charge of oversight and management of the grievance process. (Doc. No. 27-1, pp. 1-4). These sources reveal that the GDC employs a three-step grievance procedure: first, the inmate must file an informal complaint within 10 days of the incident about which he complains; second, if he is not satisfied with the response to his informal complaint, the inmate must file a formal grievance within 5 days of that response, which is then investigated and responded to by the Warden; finally, if the inmate is not satisfied with the Warden's response to his formal grievance, he may appeal the decision within 5 days of that response to the GDC Commissioner's Office, (Doc. No. 27-1, pp. 2, 8-12). Accordingly, exhausting the GDC's available administrative remedies means completing all three of these steps and receiving a final decision on appeal from the GDC Commissioner's Office.

> FN2. Although D. Ray James Prison is a private facility operated by Cornell Corporation through a contract with the GDC, the GDC's Standard Operating Procedures still apply to the facility and its inmates. The regulations in question apply to "[a]ll inmates committed to the Department of Corrections in state facilities, private prisons, county prisons, and transitional centers." SOP IIB05-0001 (II). *See also* Doc. No. 27, p. 1 (indicating that the GDC inmate grievance system is utilized at D. Ray James Prison).

Defendant contends that Plaintiff filed no formal grievances or grievance appeals concerning the claims in question prior to filing suit. In her affidavit, Michelle Howell states that prison records reveal only two informal grievances relating to food service issues filed by Plaintiff, both of which were "rejected based on the prisoner plaintiff's failure to comply with the policies governing the GDOC's in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2986405 (S.D.Ga.)
**(Cite as: 2007 WL 2986405 (S.D.Ga.))**

mate grievance system." (Doc. No. 27-1, p. 2), Indeed, Howell has appended to her affidavit copies of two informal grievance forms signed by Plaintiff. (Doc. No. 27-1, pp. 26-27). Howell submits that the June 30, 2006 form pertains to the alleged stone contamination incident at issue in this case, and that the July 14, 2006 form pertains to a meal allegedly served late. (Doc. No. 27-1, pp. 2-3). According to Howell, the June 30 grievance was returned to Plaintiff because he submitted more than one informal grievance in one week, in violation of Standard Operating Procedure. (Doc. No. 27-1, pp, 2-3, 8). The July 14 grievance was returned to Plaintiff because it was not submitted within 10 days of the incident in question. (Doc. No. 27-1, p. 3). Howell asserts that these two documents are the extent of Plaintiff's submissions on file relating to food service issues. (*Id.*).

*4 In response, Plaintiff details his allegations relating to the stone contamination incident, and refers to "grievances introduced as evidence." (Doc. No. 33, p. 4). As part of his Motion to Suppress Affidavit of Michelle Howell, Plaintiff submitted copies of five informal grievance forms, all filled out by him and dated between November 2006 and April 2007. (Doc. No. 32-3, pp. 15-19). None of these forms, however, were completed by staff in the appropriate spaces or signed by Plaintiff acknowledging receipt of a response. (*Id.*). Furthermore, none of the forms even bears a date prior to August 23, 2006, the date on which Plaintiff filed his Complaint in this case. Plaintiff has also shown no evidence of his having gone beyond the initial first step of the administrative review process, as he has submitted no record of any formal grievance or appeal of his complaint.

Plaintiff appears to contend that he should not have to exhaust the administrative remedies at D. Ray James Prison because that process would not provide redress. (Doc. No. 33, p. 23). Plaintiff's argument, however, is without merit. As stated, the exhaustion requirement of the PLRA is *mandatory.* 42 U.S.C.A. § 1997e(a) specifically states, "No ac-

tion shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law ... until such administrative remedies as are available are exhausted," Through this statute, Congress has clearly mandated that an inmate *must* exhaust his administrative remedies prior to filing a lawsuit. *Alexander v. Hawk,* 159 F.3d 1321, 1326-27 (11th Cir.1998). "Since exhaustion is now a precondition to suit, the courts cannot simply waive those requirements where they determine they are futile or inadequate." *Id.* at 1326.

In sum, Plaintiff has failed to establish the existence of a genuine issue of material fact in response to Defendant's assertion that he failed to exhaust his administrative remedies, and thus dismissal of Plaintiff's Complaint is appropriate. It is therefore unnecessary to address the remaining issues raised by Defendant's Motion.

### *CONCLUSION*

Based on the foregoing, it is my **RECOMMENDATION** that Defendant's Motion for Summary Judgment (Doc. No. 25) be **GRANTED.** Plaintiff's Complaint should be **DISMISSED,** without prejudice, due to Plaintiff's failure to exhaust his administrative remedies prior to filing his complaint.

**SO REPORTED AND RECOMMENDED,** this *26th* day of July, 2007.

S.D.Ga.,2007.
Harris v. Hall
Not Reported in F.Supp.2d, 2007 WL 2986405 (S.D.Ga.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Gemeil SCOTT, Plaintiff,
v.
Glenn GOORD, individually and in his capacity as
Commissioner of the New York State Department
of Correctional Services; Christopher Artuz, indi-
vidually and in his capacity as Superintendent of
Green Haven Correctional Facility; Charles Grein-
er, individually and in his capacity as Superintend-
ent of Green Haven Correctional Facility; Carl J.
Koenigsmann, M.D., Facility Health Services Dir-
ector at Green Haven Correctional Facility; Dr.
John Bendheim, individually and in his capacity as
Doctor of Green Haven Correctional Facility; Dr.
Lester Silver, individually and in his capacity as
Doctor of Green Haven Correctional Facility;
Sandra Fila, individually and in her capacity as a
Nurse at Green Haven Correctional Facility; Ser-
geant George Schwartzman, individually and in his
capacity as Department of Corrections Officer of
Green Haven Correctional Facility; and "John
Doe's" 1 through 10, individually and in their capa-
cities of employment at Green Haven Correctional
Facility, Defendants.

No. 01Civ.0847(LTS)(AJP).
Oct. 27, 2004.

Daly, Bamundo, Zwal & Schermerhorn, L.L.P., By:
John A. Howard, New York, New York, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New
York, By: Donald Nowve, Assistant Attorney Gen-
eral, New York, New York, for Defendant.

*OPINION AND ORDER*
SWAIN, J.
　*1 Plaintiff Gemeil Scott ("Plaintiff"), who
was at relevant times an inmate at Green Haven

Correctional Facility ("Green Haven"), brings this
action against several employees of Green Haven in
their individual and official capacities. Plaintiff
seeks damages, injunctive relief and an award of at-
torneys' fees, contending that Defendants acted
with gross negligence and deliberate indifference to
Plaintiff's medical needs. denied Plaintiff access to
a prison cell properly equipped to accommodate
Plaintiff's disability and, as a result of the alleged
failures to provide appropriate medical care and
housing, denied Plaintiff the opportunity to parti-
cipate in a number of prison programs. Plaintiff as-
serts that Defendants violated the Civil Rights Act
of 1964, 42 U.S.C.A. §§ 1983, 1985, 1986, *et. seq.,*
the Americans with Disabilities Act of 1990, 42
U.S.C.A. § 12101. et. seq. (the "ADA"), the Rehab-
ilitation Act of 1973, 29 U.S.C.A. § 701, *et.* seq.
(the "Rehabilitation Act"), federal regulations im-
plementing the ADA, the Fifth, Eighth, and Four-
teenth Amendments to the United States Constitu-
tion, and New York Corrections Law §§ 70(2).
71(1), 136, 137, 148, 401. *et. seq.* Scott also asserts
that defendants have violated a modified final con-
sent judgment entered in *Milburn v. Coughlin,* No.
79 Civ. 5077 (S.D.N.Y.), and purports to seek relief
under the provisions of that judgment.

　On August 11, 2003, by order of partial dis-
missal, all claims against Defendants Glenn Goord.
Christopher Artuz and Charles Greiner were dis-
missed. Plaintiff later withdrew all of his claims
against Defendant George Schwartzman.

　The remaining Defendants-Facility Health Ser-
vices Director Carl Koenigsmann, Dr. John Bend-
heim. Dr. Lester Silver, and Nurse Sandra Fila-now
move pursuant to Rule 56(c) of the Federal Rules of
Civil Procedure, seeking summary judgment on all
of the claims asserted against them in Plaintiff's
Second Amended Complaint (the "Complaint").
The Court has subject matter jurisdiction of
Plaintiff's federal claims in this matter pursuant to
28 U.S.C. § 1331. The Court has thoroughly con-
sidered all submissions in connection with the in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attachment 4

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

stant motion. For the reasons discussed below, Defendants' motion for summary judgment is granted in part and denied in part.

### I. BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiff is a paraplegic, wheelchair-bound inmate who was in his early twenties at the time of the events at issue here and has been in the custody of the New York State Department of Corrections since 1994. (Sec. Am. Compl. at ¶ 5). His paraplegia is the result of a gunshot wound unrelated to the matters at issue in this litigation. Plaintiff was transferred to Green Haven in May 1997.

Plaintiff suffered from chronic osteomyelitis (a bone infection) in his left femur and related decubitus ulcers of the left hip, among other medical problems, before and during his incarceration at Green Haven. (Defs.' Statement Pursuant to Local Rule 56.1 ("D56.1") ¶¶ 25-27, 87.[FN1]) Plaintiff underwent plastic surgery for his hip ulcers shortly before his transfer to Green Haven.

> FN1. All references to the parties' Rule 56.1 statements and other factual submissions in connection with this motion refer as well to the evidence cited in the referenced paragraphs.

**\*2** From March 1999. Defendant Carl J. Koenigsmann, M.D., served as the Facility Health Services Director ("FHSD") at Green Haven. His role was primarily supervisory. Koenigsmann oversaw the care rendered by Green Haven primary care providers and reviewed requests for outside specialty care, which he could deny or approve. (D56.1 ¶¶ 5, 7.)

Defendant John Bendheim, M.D., was at relevant times a primary care physician at Green Haven whose chief responsibilities were to diagnose and treat patients' ailments and to coordinate speciality care for his patients. (Id. ¶¶ 11-12.) Bendheim was Plaintiff's primary care physician from May 1997 to June 1999. (Id. ¶¶ 13-14.)

Defendant Lester Silver, M.D., succeeded Bendheim as Plaintiff's primary care physician in or about June 1999. and continued in that capacity until early 2003. (Id. ¶ 17.)

Defendant Sandra Fila. R.N., was at relevant times a Registered Nurse II at Green Haven and worked in that capacity in Green Haven's Unit for the Physically Disabled ("UPD") until carly 2000. ( Id. ¶¶ 20-21.)

### Plaintiff's Medical Treatment and Housing at Green Haven Prior to February 1999

From his May 1997 arrival at Green Haven until January 8, 1999, Plaintiff was housed in Green Haven's Unit for the Physically Disabled ("UPD"), in a cell that was fitted with equipment that improved its accessibility (e.g., grip bars, accessible sink and toilet, and a wheelchair-accessible bed) and that had a door opening wide enough to accommodate Plaintiff's regular wheelchair. Plaintiff asserts that he was able to "ambulate upright," with the aid of braces, from his arrival at Green Haven until February 1999. (Decl. of Gemeil Scott, dated December 17, 2003 ("Seott Decl."). ¶ 4.)

Plaintiff claims that he was given no treatment for his osteomyelitis after the transfer to Green Haven. that his osteomyelitis worsened in 1998 and that he complained to Bendheim at that time of severe pain and burning in his hip. Bendheim initiated a referral to a plastic surgeon on July 3, 1998, for consultation regarding treatment of the hip.[FN2] Plaintiff continued to complain of pain and demanded that Bendheim refer him to an orthopedic surgeon, rather than a plastic surgeon, for consultation. (Pl.'s Consolidated Statement of Material Facts ("PCSF") ¶¶ 33-35.) Plaintiff refused to cooperate in the effort to obtain a consultation with a plastic surgeon. Plaintiff refused to leave Green Haven for consultations with the plastic surgeon on October 8, November 12 and December 10, 1998. The "Inmate Refusal Forms" relating to these incidents reflect that Plaintiff indicated that he was too unwell to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
(Cite as: 2004 WL 2403853 (S.D.N.Y.))

leave the facility on the November and December dates. (Declaration of John Bendheim, M.D., dated November 3, 2003 ("Bendheim Decl."), ¶ 31 and Ex. G.) The relationship between Bendheim and Plaintiff deteriorated as the disagreement mounted. (PCSF ¶ 36; Bendheim Decl. ¶ 31.) [FN3]

FN2. Scheduling of a consultation pursuant to the request was delayed for several weeks by an outside review agency, which claimed that it had not received sufficient documentation with Bendheim's original request. (Bendheim Decl. ¶¶ 29-30.)

FN3. Plaintiff asserts that Bendheim later cursed at him and threatened him physically in a dispute over whether a plastic surgery consultation, rather than an orthopedic one, was the correct course of action. Plaintiff filed a grievance in March 1999 over this alleged incident and his hip treatment in general. The grievance also asserted that the alleged failure to treat Plaintiff's hip problem properly had prevented Plaintiff from participating in the prison's work-release, drafting and art school programs. (Scott Decl. ¶ 19.) The Facility Health Services Director's later response to the grievance acknowledged "friction" and resulting "emotional strain" on both Plaintiff and Bendheim. (Id. Ex. 2.)

*3 On January 8, 1999, pursuant to the request of Sergeant Schwartzmann ("Schwartzmann"),[FN4] Plaintiff was transferred from Cell C4-13 of the UPD [FN5] to a new cell (C1-22) in the UPD. Although Defendants assert generally that all cells in the UPD are accessible, Plaintiff claims that the doorways of cells on the "1 Company" corridor of the UPD (the location of the new cell) are unable to accommodate his regular wheelchair, whereas the doorways of the "4 Company" corridor (on which he had been housed since his arrival at Green Haven) were wide enough to accommodate all wheelchairs. (PCFS ¶ 7.) Plaintiff was unable to

enter the new cell while seated in his regular wheelchair, and the cell lacked the accessibility equipment, including railings, that had been present in Plaintiff's original cell. Plaintiff was provided with a second wheelchair for ambulation within the cell. He had to swing from one wheelchair to the other, while holding onto the target chair or the cell bars, to enter the cell. (PCFS ¶¶ 54-57.) Plaintiff does not contest that his transfer to C1-22 was for security reasons, but claims that appropriately accessible alternate housing was available in Green Haven's infirmary at the time. (Mem. of Law in Opp. to Def's Mot. for Summ. J. at 35; PCSF ¶ 58 n. 19.)

FN4. As noted above. Plaintiff has withdrawn his claim as against Schwartzmann.

FN5. Declaration of Lester Silver. dated November 3, 2003 ("Silver Decl."), at ¶ 8.

Plaintiff asserts that he complained to Bendheim and Fila that the new cell assignment was inappropriate and asked to be transferred to an accessible cell, and further asserts that Green Haven medical personnel, including Bendheim and Fila, had the authority at the time to transfer him to an accessible cell. (PCSF ¶ 59.) He alleges that Fila refused to help him because he had filed an earlier grievance against her and that Bendheim refused to help him because of the deterioration in their doctor-patient relationship over the treatment of Plaintiff's osteomyelitis. (PCSF ¶ 60.) [FN6]

FN6. On February 9, 1999, Plaintiff filed a written grievance regarding his transfer to cell C1-22 and. by February 23, 1999, Plaintiff was transferred to cell C1-6, which had rails around the sink and toilet. (D56.1 ¶ 116). As noted above, Plaintiff asserts that none of the cells on the "I Company" side of the UPD, including cell C1-6, had door openings wide enough to permit his wheelchair to enter. (PCSF ¶ 71, n. 21; Scott Decl. ¶ 40.)

On February 2, 1999, allegedly while he was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
(Cite as: 2004 WL 2403853 (S.D.N.Y.))

Page 4

transferring from his bed to his wheelchair in the new cell, Plaintiff fell and injured his knee. Plaintiff alleges that the absence of "appropriate wheelchair safety equipment" caused this fall. (PCSF ¶ 61.) Plaintiff alleges that Bendheim refused to see Plaintiff in the infirmary immediately after the fall. (Id.; Scott Decl. ¶ 33.) Later that day, Plaintiff was treated in Green Haven's emergency room by Dr. Silver and was given ice and nonsteroidal anti-inflammatory pain medication. (D56.1 ¶¶ 29-30.) Silver noted a contusion and recommended orthopedic followup. (PCSF ¶ 62; D56.1 ¶ 29.) Plaintiff subsequently complained of pain and swelling in his knee and received additional treatment. Bendheim ordered an orthopedic specialist consultation for the knee on February 7, 1999. (D56.1 ¶ 31.) Plaintiff was seen by a consultant on February 10, 1999, who performed an aspiration and recommended an MRI. (PCSF ¶¶ 62, 65; D56.1 ¶¶ 30-31.)

Plaintiff claims that Bendheim inappropriately refused to act on Plaintiff's verbal report to him of the MRI recommendation, leading Plaintiff to file a grievance regarding the MRI on February 12, 1999. (PCSF ¶ 66.) On February 21, 1999, Bendheim noted persistent effusion in the knee and ordered an orthopedic consult for followup concerning Plaintiff's knee and hip problems. (PCSF ¶ 67; D56.1 ¶ 32; Bendheim Decl. ¶ 33.) Bendheim asserts that the orthopedic consultant never recommended an MRI, and that he obtained an MRI "even in the absence of such a recommendation." (Bendheim Decl. ¶ 17.) The MRI, which was performed on March 8, 1999. revealed Plaintiff's knee had a medial meniscus tear. The orthopedist, who saw Plaintiff on or about April 21, 1999, recommended that warm compresses be applied to Plaintiff's knee and did not address Plaintiff's hip problem. (PCSF ¶ 68: D56.1 ¶¶ 33, 34, 36.) On April 22, 1999, Bendheim ordered a further orthopedic consultation to address the hip problem. (Bendheim Decl. ¶ 34.) A May 17, 1999, report of that consultation recommends an x-ray and MRI but not surgery. (Bendheim Dec. ¶ 35 and Ex. H.)

An x-ray was performed at Green Haven; in a July 19, 1999, note in connection with another consultation request, Defendant Silver appears to have written that "CPS" had denied permission for the MRI. (Silver Decl. Exh. C.) [FN7]

> FN7. According to Bendheim's declaration, "requests for treatment by outside medical specialists were reviewed by a private outside managed care company called Correctional Physician Services ("CPS") "during at least a portion of the period at issue in this litigation. (Bendheim Decl. ¶ 29.)

*4 Plaintiff alleges that he received no further treatment for his knee through June 1999, despite his regular complaints of daily pain. Bendheim asserts that physical therapy was prescribed at some unspecified time by Green Haven "staff" but does not indicate whether the prescribed treatment was carried out; Plaintiff asserts that the physical therapy was not prescribed until after he had filed a grievance concerning implementation of a recommendation of physical therapy. (See Bendheim Decl. ¶ 21; D56.1 ¶ 38; Scott Decl. ¶ 37; Pl.'s Resp. to Defs.' Rule 56.1 Stmt. ("PR56.1") ¶ 38.) Bendheim similarly asserts that Plaintiff was "frequently evaluated medically" and that he prescribed medication because of persistent swelling and symptoms, but provides no specifies as to relevant dates, diagnoses. or treatment. (See Bendheim Decl. ¶ 22.) Plaintiff claims that, because the knee would not bend, he suffered severe pain in the leg each time he had to swing from one wheelchair to another to enter his cell or from the wheelchair onto the bed or toilet once inside the cell. (PCSF ¶ 71 and n. 21.)

On July 19, 1999, Silver (who had taken over as Plaintiff's primary care physician) noted that Plaintiff had a persistent problem with his knee and requested an examination of Plaintiff's knee and hip by a specialist. (Silver Decl. ¶ 15; PCSF ¶ 72.) In a July 25, 1999, grievance (attached as an exhibit to Scott's Declaration), Scott asserted that Silver was improperly delaying treatment of his knee and hip and that he had informed Silver of a loss of range

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

Page 5

of motion in his knee, his inability to use his leg braces, and of tissue loss in his hip. (Scott Decl. Ex. 7.) Scott also alleges that Silver delayed treatment further following an appeal from the grievance. (Scott Decl. ¶ 42 n. 2.) An August 9, 1999, further consultation request for a "2d opinion," apparently prepared by Silver prior to the specialist's examination of Plaintiff, appears to have been initialed by defendant Koenigsmann and includes a request, in handwriting different from the body of Silver's request, for "options with respect to pain relief in paraplegic pt." (PCSF Ex. 31.)

On August 18, 1999, the orthopedic specialist recommended an arthroscopic meniscectomy surgical procedure for the knee and prescribed pain medication for Plaintiff. (PCSF ¶ 73; Silver Decl. ¶ 16.). The orthopedist did not, however, address Plaintiff's hip in the consultation report. (PCSF ¶¶ 41-43, 75-76; Silver Decl. Ex. C; PR56.1 ¶¶ 75-76.) Silver put in an August 23, 1999, request that the recommended knee surgery be scheduled; the request form indicates a September 3 "provider request" and is annotated "Awaiting 2nd opinion-cancelled," with the date and initials "CK 9/22." (PCSF Ex. 32.) Plaintiff asserts that, on September 9, 1999, Koenigsmann cancelled the request for surgery and submitted instead a request for a further second opinion and, according to Plaintiff, assigned a "low-urgency 'October clinic'" appointment for followup (see PSCF ¶ 75).FN8 On October 5, 1999, a Dr. Schwartz responded to this "second opinion" request. finding that Plaintiff was "a candidate for meniscal repair " but recommending that drainage from Plaintiff's hip bone infection (osteomyelitis) be addressed prior to any knee surgery. (PCSF 76 and Ex. 3; D56.1 ¶¶ 46-47.) Plaintiff contends that the state of his hip at that time was attributable to the alleged failure of Defendants Bendheim, Silver and Koenigsmann properly to treat the osteomyelitis and ulcer conditions. (PR56.1 ¶ 45.) Defendants contend that the surgery was delayed "at least in part" by Plaintiff's desire for a second opinion. (D56.1 ¶ 44; Silver Decl. ¶ 17.) Plaintiff denies ever seeking a second opinion

regarding the knee surgery. (Scott Decl. ¶ 44; PCSF ¶ 74 n. 22.)

> FN8. Exhibit 3 to the PCSF is a September 17, 1999, request, under the names of "Silver/Koenigsmann" and marked "October Clinic," for a second opinion on the knee surgery recommendation. (PCSF Exh. 3.)

*5 Plaintiff asserts that, "[a]t one point, the combination of the infection in my hip bone and related decubitus ulcers became so severe that my skin in the affected area deteriorated to the point that my leg bone was plainly exposed in the area of the hip socket." (Scott Decl. ¶ 23.) An infectious disease specialist referral was prepared on October 6, 1999, and Plaintiff was examined by Dr. Rush, an infectious disease specialist, on December 1, 1999.FN9 Rush noted a deep buttock wound and recommended an MRI and x-ray to evaluate the existence and extent of dead bone in Plaintiff's hip area. Rush also recommended surgical debridement of the bone and treatment of the hip infection with antibiotics pending the surgery. (PCSF ¶ 45 and Exh. 17; D56.1 ¶ 80.) On or about December 9, 1999, before the MRI was performed, Silver attempted to schedule the debridement; the procedure was cancelled. (PCSF Exh. 21 .) The parties dispute whether, and to what extent. Plaintiff's request for an autologous blood donation in connection with the surgery played a role in the cancellation. (See PCSF ¶ 47.) The debridement procedure and a plastic surgery "flap rotation" to cover Plaintiff's ulcers were performed on May 31, 2000. (PCSF ¶ 48; D56.1 ¶ 82.) FN10 A post-surgical examination in June 2000 concluded that there was no longer any evidence of infection in Plaintiff's hip. (PCSF ¶ 78.)

> FN9. In a November 1999, response to a September 22, 1999, request by Silver to the orthopedic consultant for a further recommendation as to whether an MRI should be performed in connection with evaluation and treatment of Plaintiff's osteomyelitis, the consultant recommended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
(Cite as: 2004 WL 2403853 (S.D.N.Y.))

the MRI and a sinogram. (PCSF Ex. 18.) The parties agree that Silver ordered the MRI, as recommended, on November 22, 1999. (D56.1 ¶ 77; PR56.1 ¶ 77.)

FN10. Defendants, citing printouts purporting to list multiple contacts by Plaintiff with various medical providers, assert that Plaintiff "received regular periodic followup specialty care" during the period from November 1999 to May 2000, including three contacts with "the orthopedist" and contact with the infectious disease consultant. (DR56.1 ¶ 83; Silver Decl. ¶ 32.) Plaintiff does not specifically deny that the contacts took place but, rather, observes that there may be an authenticity issue with the printouts and notes that Defendants do not proffer explanations as to the subject matter of the various appointments. (PR56.1 ¶ 83.)

Neither side proffers that any immediate action was taken to address Plaintiff's knee condition following the successful hip surgery. On October 12, 2000, Defendant Silver requested an additional opinion regarding treatment of the knee. On November 9, 2000, Dr. Stephen Schwartz again recommended surgery for the knee. (PCSF ¶ 78, D56.1 ¶ 51.) On November 12, 2000, Silver requested that the surgery be booked. (Declaration of Carl J. Koenigsmann, dated October 28, 2003 ("Koenigsmann Decl.), Ex. A.) Koenigsmann denied permission for the recommended surgery on November 14, 2000; Koenigsman asserts that did so because he wanted a second opinion from a rehabilitation specialist as to the risks and benefits of such surgery "on the non-weight bearing affected knee of a paraplegic patient." (Koenigsmann Decl. ¶ 16.) Plaintiff alleges that, by late 2000, he was suffering intense pain in the knee joint and could "feel the leg bones grinding and hear them popping every time he attempted to bend his left leg." (PCSF ¶ 79.) On December 22, 2000, after the rehabilitation specialist had "addressed [his] concerns about the medical

necessity of the proposed surgery," Koenigsmann requested the surgery for Plaintiff. The specialist's response refers to potential for the joint "locking" as well as to pain. Koenigsmann requested that the surgery be scheduled for eight weeks later. (Koenigsmann Decl. ¶ 17 and Exh. A.) Koenigsmann underwent arthroscopic surgery on the knee on April 12, 2001. (PCSF ¶ 80; D56.1 ¶ 52.) [FN11] The surgery ameliorated Plaintiff's knee problem. (PCSF ¶ 82). Plaintiff asserts that, beginning in 1999 after Koenigsmann assumed the FHSD post, he had many conversations with Koenigsmann concerning his medical treatment issues, including those relating to the ulcers and osteomyletis. (Scott Decl. ¶ 13; see Tr. of Koenigsmann Dep., Ex. 4 to PCSF, at 13-14, 64-66, 111.)

FN11. Defendants again generally allege that Plaintiff underwent numerous consultations and preoperative tests during the period from May 30, 2000 to March 27, 2002 (when Plaintiff had a hip replacement surgery that is not the subject of the instant complaint). (Silver Decl. ¶ 33; D56.1 ¶ 88.) Plaintiff again responds that Defendants' documentation is insufficient to establish that the consultations and procedures occurred and what their purpose was. (PR56.1 ¶ 88.)

*6 While the overall chronology of events is largely undisputed, there is intense disagreement between the parties as to the medical propriety of, and reasons for, the extended timetable leading to orthopedic surgical treatment of Plaintiff's hip and knee problems. Plaintiff alleges that Defendants refused to provide him with "necessary medical treatment and testing, including but not limited to surgery, antibiotics, physical therapy and tests for his swollen knee and damaged hip." (Sec.Am.Compl.¶ 21). Plaintiff contends that Defendants "continually and persistently ignored [his] complaints," and "engaged in a pattern of [ (sic) ] practice with [ (sic) ] deliberate indifference to the Plaintiff's serious medical needs." (Id. ¶¶ 21, 24.) Plaintiff argues,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

in essence, that defendants Bendheim, Silver and Koenigsmann [FN12] were deliberately indifferent to Plaintiff's pain, mobility problems and alleged deterioration resulting from lack of, or inappropriate, treatment of the conditions. Plaintiff also asserts that the multiple requests for second opinions regarding surgical treatment of his knee were extraordinary and contrary to normal DOCS procedures. (*See, e.g.,* PCSF ¶ 75 and n. 23.)

> FN12. Plaintiff makes no specific assertions regarding any treatment decisions by defendant Fila, nor that she had authority to make any of the treatment decisions challenged here. Rather, Plaintiff argues that she had authority to move him from the inaccessible cell and is properly a defendant on the ADA claim, and that she brought a false disciplinary charge against him in retaliation for a grievance Plaintiff had lodged against her. *See infra* sections II B. and C.

Defendants claim that the delays in surgical treatments were the proper result of a number of appropriate factors, including non-surgical treatments, exploration of less aggressive surgical treatment, delays arising from Plaintiff's objections to some treatments and/or requests for second opinions or other procedures in connection with surgical treatments, and delays inherent in the process of obtaining referrals and attention from outside consultants. The largely conclusory expert affidavits submitted by both sides do little to reconcile the underlying factual controversies or elucidate their legal or medical significance.

Plaintiff seeks monetary damages, injunctive relief mandating that Defendants provide "appropriate medical care and treatment," and an award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. The injunctive aspect of Plaintiff's request for relief appears to have been mooted by his transfer out of Green Haven following the briefing of this motion. (*See* letters from defense counsel, dated April 23, 2004 and August 18, 2004, concerning transfers to Shawangunk Correctional Facility and Five Points Correctional Facility, respectively.)

## II. *DISCUSSION*

### A. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "A factual issue is genuine if it can reasonably be resolved in favor of either party," and "[a] fact is material if it can affect the outcome of the action based on the governing law." *David v. N.Y.P.D. 42nd Precinct Warrant Squad,* No. 02 Civ. 2581(DC), 2004 WL 1878777, at *3 (S.D.N.Y. Aug. 23, 2004) (citing *Anderson,* 477 U.S. at 248, 250). Initially, the burden is on the moving party to demonstrate the absence of any genuine issues of material fact." *Harrison v. Potter,* 323 F.Supp.2d 593, 599 (S .D.N.Y.2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ). If the moving party satisfies its burden, the burden then "shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists." *Am. Home Assurance Co. v. Zim Jamaica,* 296 F.Supp.2d 494, 498-99 (S.D.N.Y.2003). In resolving a motion for summary judgment, "the Court must view the evidence in a light that is favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Harrison,* 323 F.Supp.2d at 599 (citing *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)).

### B. Americans with Disabilities Act and Rehabilitation Act Claims

### 1. Exhaustion of Administrative Remedies

*7 The Prison Litigation Reform Act of 1995,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

42 U.S.C. § 1997e, provides in pertinent part that

No action shall be brought with respect to pris-on conditions under section 1983 of this title, *or any other Federal law,* by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997(e)(a) (West 2003) (emphasis supplied.) There is no dispute that Plaintiff has exhausted his internal prison grievance remedies with respect to all of his claims. It is also undisputed, however, that he has not pursued feder-al administrative proceedings in connection with his claims asserted under the ADA and the Rehab-itation Act. Defendants move to dismiss the com-plaint in its entirety for non-exhaustion, arguing that section 1997e(a) precludes the maintenance of any action where administrative remedies had not been exhausted with respect to any claim raised in the action prior to commencement of the action. Plaintiff argues that he should not be required to exhaust the federal administrative remedies and that, in any event, any failure to exhaust remedies with respect to this set of claims should not compel dismissal of this action in its entirety.

In *Porter v. Nussle,* 534 U.S. 516 (2002), the Supreme Court held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excess-ive force or some other wrong." *Id.* at 532. Exhaus-tion is required even when a prisoner seeks relief that is not available in the administrative proceed-ings; the *Nussle* Court recognized that

Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose. Congress afforded corrections offi-cials time and opportunity to address complaints in-ternally before allowing the initiation of a federal case.... [F]or cases ultimately brought to court, ad-judication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Id.* at 524-25. The United States Department of Justice has established administrative procedures for the assertion and investigation of complaints re-garding alleged violations of the ADA and the Re-habilitation Act in correctional facilities. The agency designated to investigate the complaints (the Department of Justice, in the case of com-plaints regarding correctional institutions) is oblig-ated to seek informal resolution, issue a Letter of Findings (which is to include findings of fact, con-clusions of law and a description of an appropriate remedy for each violation found) if no informal res-olution is reached and, with respect to the ADA procedure, if a Letter of Findings identifying a viol-ation is issued, seek to negotiate a voluntary com-pliance agreement with the respondent public en-tity. *See* 28 C.F.R. §§ 35.170-35.173, 35.190(b)(6), 39.170. This is precisely the sort of pre-litigation process contemplated by the *Nussle* Court, and sec-tion 1997e clearly applies the exhaustion of remed-ies mandate to the ADA and Rehabilitation Act as "other Federal law." Accordingly, the section 1997e(a) exhaustion requirement applies to Plaintiff's ADA and Rehabilitation Act claims. *See Rosario v. N.Y.S. Dept. of Corr. Services,* No. 03 Civ. 859(CLB), 2003 U.S. Dist. Lexis 18032 (S.D.N.Y. Sept. 24, 2003); *Burgess v. Garvin,* No. 01 Civ. 10994(GEL), 2003 U.S. Dist. LEXIS 14419 (S.D.N.Y. Aug. 18, 2003).

**\*8** In that Plaintiff has not satisfied the PLRA's exhaustion requirement with respect to two of his claims, the question is whether this action can be maintained at all, or whether it must be dismissed in its entirety. The Second Circuit addressed this is-sue squarely in *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004), holding that the presence of an unex-hausted claim in a prisoner's lawsuit does not re-quire a district court to dismiss the action in its en-tirety, and that the district court may, upon dis-missal of the unexhausted claim, proceed to address the exhausted claims without awaiting any attempt by the plaintiff to exhaust remedies on the dis-missed claim. *Id.* at 663. In light of this holding, and of the judicial economy considerations dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

cussed in the *Ortiz* decision, the Court will not dismiss Plaintiff's action in its entirety by reason of the failure to exhaust administrative remedies with respect to the ADA and Rehabilitation Act Claims.

*2. Dismissal of ADA and Rehabilitation Act Damages Claims on Merits, Injunctive Claims as Moot*

Plaintiff has named as defendants only individuals, asserting ADA and Rehabilitation Act claims against them for damages and injunctive relief. However, "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir.2001). " 'Individual defendants may not be held personally liable for alleged violations of the ADA or Rehabilitation Act.' Nor can individuals be named in their official or representative capacities as defendants in ADA or Rehabilitation Act suits." *Menes v. CUNY University*, 92 F.Supp.2d 294, 306 (S.D.N.Y.2000) (internal citations omitted). Plaintiff's ADA and Rehabilitation Act claims against Defendants therefore must fail insofar as they seek to recover damages for alleged violations of those statutes. *See Ford v. Conway*, No. 03-CV-0927S, 2004 WL 1071171, at *3 (W.D.N.Y. Mar. 16, 2004) (indicating the proper party to be sued was the Department of Correctional Services, not prison employees in their official and individual capacities).

Plaintiff argues that he should be able to proceed against the named individuals insofar as he seeks injunctive relief, pursuant to the principles enunciated by the Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908). The Second Circuit held in *Henrietta D. v. Bloomberg*, 331 F.3d 261, 287-88 (2d Cir.2003), that such a claim could be maintained against a state officer named in her official capacity. Plaintiff's injunctive relief claims as against these defendants appear, however, to be moot, as Plaintiff has been transferred out of Green Haven and nothing in the record on this motion or in Plaintiff's counsel's communications with the Court concerning the subsequent transfers suggests

that any of the remaining Defendants has any control over his current housing or medical care. *See supra* pp. 14-15.

*9 Section 1997e(c)(2) of the PLRA permits the dismissal of a claim that "fails to state a claim upon which relief can be granted .... without first requiring the exhaustion of administrative remedies." 42 U.S.C.A. § 1997e(c)(2) (West 2003). In that Plaintiff's damages claims against the named Defendants cannot be maintained and no effective injunctive relief can be granted as against those Defendants, who are no longer in charge of Plaintiff's housing or medical care, Defendants' motion for summary judgment will be granted insofar as it is directed to Plaintiff's claims under the ADA and the Rehabilitation Act (Second Cause of Action, Sec. Am. Compl. ¶¶ 30-38). This grant of summary judgment in favor of the named Defendants does not preclude Plaintiff from seeking to pursue his ADA and Rehabilitation Act claims, administratively and in any appropriate fashion thereafter, against the appropriate State entity.

*C. Plaintiff's Eighth Amendment Claim*

"The Eighth Amendment's prohibition against cruel and unusual punishment of prison inmates has been construed to include the denial of adequate medical care." *Woods v. Goord*, No. 01 Civ. 3255(SAS), 2002 WL 731691, at *3 (S.D.N.Y. Apr. 23, 2002). "To sustain a claim of improper medical treatment, plaintiff must allege facts demonstrating that prison officials were deliberately indifferent to his condition." *Lumaj v. Williams*, No. 03 Civ. 1849(PKC), 2004 WL 1207894, at *3 (S.D.N.Y. June 2, 2004). The "deliberately indifferent" standard is composed of an objective and subjective test. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003). Plaintiff alleges that Defendants Bendheim, Silver and Koenigsmann violated his Eighth Amendment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

rights.[FN13]

> FN13. Plaintiff has apparently abandoned his Eighth Amendment claim as against Defendant Fila. *See* Pl.'s Mem. In Opp. at, *e.g.,* 24 ("Defendants Koenigsmann, Bendheim and Silver were Deliberately Indifferent to Scott's Serious Medical Needs"). He has in any event failed to proffer evidence sufficient to support a verdict against Fila on his Eighth Amendment claim. Summary judgment will therefore be granted in Fila's favor on the Eighth Amendment claim (First Cause of Action. Sec. Am. Compl. ¶¶ 1-29).

*1. Objective Element*

A medical need is "sufficiently serious" to support an Eighth Amendment claim when it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal citations and quotation marks omitted). "Because '[t]he objective component of an Eighth Amendment claim is' ... fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185 (internal citations omitted). Relevant factors in determining the severity of Plaintiff's medical condition include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal citation and quotation marks omitted).

**\*10** Plaintiff has proffered evidence that he suffered, and complained consistently of, persistent severe pain in his knee and hip over periods of two or more years, that he was unable to use braces for ambulation after he suffered the knee injury, that he suffered extreme tissue loss at the site of the bone infection, and that he had difficulty transferring in and out of his wheelchair due to inability to bend

the injured knee. This evidence, coupled with Green Haven's documentation of his medical condition and the treatment recommendations of the outside consultants during the period in question is, when viewed in the light most favorable to Plaintiff, sufficient to raise a genuine issue of material fact as to whether Plaintiff's underlying medical conditions were "sufficiently serious" to support his Eighth Amendment claim.

The Second Circuit has held that, where a prisoner's Eighth Amendment complaint is of delay or interruption of otherwise adequate treatment, as opposed to refusal to provide treatment altogether, it is appropriate to

> focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.... [W]here the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner.

*Smith.* 316 F.3d at 185-86 (emphasis in original; internal citations omitted). However, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment' but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186 n. 10 (internal citation omitted).

The record reveals genuine issues of material fact even when viewed through this narrower template. Plaintiff alleges that he suffered persistent severe hip pain, that he suffered tissue loss that exposed his bone before hip surgery was finally performed, and that the condition of his knee degenerated (to the point where he perceived grinding and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

popping when he attempted to move it) during the more than two-year period between the time he suffered the injury and the time knee surgery was performed. This evidence, combined with the Green Haven medical documentation, could support a finding that the complained-of delays engendered damage that was sufficiently severe to support Plaintiff's Eighth Amendment claim. "[A] serious medical need 'exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Smith*, 316 F.3d at 187 (internal citation omitted).

*2. The Subjective Element*
**\*11** In order to satisfy the subjective component of an Eighth Amendment deliberate indifference claim, Plaintiff must demonstrate that Defendants acted with a "sufficiently culpable state of mind." *Chance*, 143 F.3d at 702 (citations omitted).

[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' *Farmer v. Brennan*, 511 U.S. 825, ___, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). The subjective element requires a state of mind that is the equivalent of criminal recklessness; namely, when the prison official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' *Id.* at ___, 114 S.Ct. at 1979....

*Hathaway v. Coughlin*, 99 F.3d at 553. " '[M]ere medical malpractice' is not tantamount to deliberate indifference, [but] certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm,' *Farmer*, 511 U.S. at ___, 114 S.Ct. at 1980." *Id.*

Here, Defendants have proffered evidence that the medical care provided to Plaintiff was appropriate and that certain delays in performing the surgeries and other procedures were due to Plaintiff's own actions, delays inherent in the specialist referral approval process, and/or the determination that addressing the hip infection warranted priority over repair of the knee injury. Defendants' evidence also indicates that they did not view Plaintiff's knee problem as urgent because he is non-ambulatory. Defendants thus contend that there is no evidentiary basis for a finding of deliberate indifference.

Plaintiff has, as noted above, proffered evidence that he suffered, and informed Defendants of, severe pain, and that his knee and hip conditions deteriorated over the time period in question. He alleges that Bendheim failed to take appropriate actions to address admittedly serious medical conditions because of hostility toward Plaintiff arising from the early disagreements as to whether plastic or orthopedic surgery was appropriate to address his hip condition. Plaintiff alleges that Silver deliberately delayed addressing the knee and hip conditions and that the delay was at least in part a reaction to a grievance filed by Plaintiff. Plaintiff points to the outside consultants' multiple recommendations of knee surgery in relation to the time it ultimately took to implement them, and Koenigsmann's requests for multiple second opinions.

Plaintiff further contends that he had been able to ambulate with the aid of braces prior to the injury and that inability to bend the knee affected his ability to move in and out of his wheelchair in connection with daily activities, and disputes many of Defendants' factual assertions, in alleging that Defendants' conduct met the subjective element of his Eighth Amendment cause of action. The evidence of record, taken as a whole, is sufficient to support reasonable inferences that Defendants Bendheim, Silver and Koenigsmann knew of and disregarded excessive risks to Plaintiff's health and safety, and that they were both aware of facts from which the inference could be drawn that a substantial risk of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
(Cite as: 2004 WL 2403853 (S.D.N.Y.))

Page 12

serious harm existed and drew that inference. Accordingly, these Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim (First Cause of Action, Sec. Am. Compl. ¶¶ 1-29) is denied.

*D. State Law Claims*
**\*12** Citing a number of provisions of the New York State Corrections Law relating to the management of prisons and prison programs, as well as *Stanback v. State,* 557 N.Y.S.2d 433 (2d Dept.1990), Plaintiff asserts claims for damages for negligence and reckless inattention to Plaintiff's serious medical needs. (Third Cause of Action, Sec. Am. Compl. ¶¶ 39-42.) These claims must be dismissed because they are precluded by section 24 of the New York State Corrections Law, which provides in pertinent part that

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of correctional services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Corr. Law. § 24 (McKinney 2003). Plaintiff's claims against Defendants clearly arise from acts within the scope of their employment. Section 24's prohibition on such suits against individual correctional services department employees precludes such litigation in federal court as well as in state court. "by conferring upon [the employees] an immunity from liability for activities that fall within the scope of the statute." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996). *Stanback v. State,* cited in Plaintiff's Complaint, provides no authority

for the maintenance of Plaintiff's claims in this Court, since that negligence case was commenced in the New York State Court of Claims, against the State of New York, as contemplated by Section 24(2).

Moreover, insofar as Plaintiff asserts claims against the Defendants in their official capacities, his damages claims are precluded by the Eleventh Amendment to the Constitution of the United States.

For the reasons discussed above in connection with Plaintiff's ADA and Rehabilitation Act claims, Plaintiff's claims are moot insofar as he seeks injunctive relief.

Accordingly, summary judgment will be granted in Defendants' favor dismissing Plaintiff's state law claims (Third Cause of Action).

*E. Claims of Conspiracy to Violate Plaintiff's Civil Rights*
Plaintiff alleges Defendants violated his civil and constitutional rights in violation of " 42 U.S.C. §§ 1983, 1985, 1986, *et. seq.,*" by conspiring to violate his constitutional and statutory rights in connection with his medical and disability-accommodation needs (Fourth Cause of Action, Sec. Am. Compl. ¶¶ 43-46.) A conspiracy claim under 42 U.S.C. § 1983 "should actually be stated as a claim under Section 1985, which applies specifically to conspiracies." *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003).

**\*13** "[I]n any case of conspiracy set forth in [ Section 1985], if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property ... the party so injured or deprived may have an action for the recovery of damages[.]" 42 U.S.C.A. § 1985(3) (West 2003). "To establish a claim under [Section 1985(3) ] plaintiff must demonstrate (1) a conspiracy (2) for the purpose of depriving [him] of equal protection of the laws or of equal privileges and im-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

munities, and (3) an act taken in furtherance of the conspiracy (4) that causes injury to the plaintiff." *Lewis v. City of New York,* No. 95 Civ. 5351, 1999 U .S. Dist. LEXIS 20008, at *67 (S.D.N.Y. Nov. 16, 1999), *report and recommendation adopted* 1999 U.S. Dist. LEXIS 19719 (S.D.N.Y. Dec. 27, 1999). Plaintiff must show that the conspiracy was "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." ' *Thomas v.. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (internal citations omitted).

Plaintiff's conspiracy claim must fail because Defendants, the alleged co-conspirators, were all employees of the state Department of Correctional Services, acting within the scope of their employment, when they allegedly violated Plaintiff's rights. The intra-corporate conspiracy doctrine, which holds that two or more employees of a corporate entity are generally legally incapable of conspiring with each other with respect to matters within the scope of their employment, applies to Section 1985 claims and bars Plaintiff's conspiracy cause of action. *See Girard v. 94th Street and Fifth Ave. Corp.,* 530 F.2d 66, 70-71 (2d Cir.1976); *Crudele v. City of New York Police Dept.,* No. 97 Civ. 6687(RCC), 2004 WL 1161174, at *5 (S.D.N.Y. May 24, 2004); *Lewis v. City of New York,* No. 95 Civ. 5351(PKL), 1999 U.S. Dist. LEXIS 20008, at *73 (S.D.N.Y. Nov. 16, 1999), *report and recommendation adopted* 1999 U.S. Dist. LEXIS 19719 (S.D.N.Y. Dec. 27, 1999).

The Court further finds that dismissal is appropriate because Plaintiff has failed to proffer any evidence from which a reasonable fact finder could conclude that a class-based animus motivated Defendants' alleged legal violations.

A claim under 42 U.S.C. § 1986 is valid only if there is a viable conspiracy claim under Section 1985. *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). Because Plaintiff has failed to state a viable claim under Section 1985, his Section 1986 claim fails as well. Defendants' motion will

therefore be granted as to Plaintiff's Fourth Cause of Action.

*F. Qualified Immunity*

"The doctrine of qualified immunity shields government officials from suits for damages arising from performance of their discretionary functions when, applying an objective standard, 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Webster v. The City of New York,* 333 F.Supp.2d 184, 203 (S.D.N.Y.2004) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The threshold question "is whether 'a 'constitutional right would have been violated were the allegations established." ' *Id.* (internal citations omitted). If that question can be answered in the affirmative, qualified immunity can be established by showing that either the government officials' "conduct [did] not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have known," or that it was "objectively reasonable for [the officials] to believe their actions were lawful at the time." ' *Id.* (internal citations omitted.)

**\*14** Defendants assert that they are entitled to dismissal of Plaintiff's Section 1983 claims on qualified immunity grounds. Plaintiff's right to be free from cruel and unusual punishment by way of the withholding or maladministration of medical care was clearly established at all relevant times by *Estelle v. Gamble,* 429 U.S. 97 (1976) and its progeny. The fact issues identified earlier in this opinion preclude any determination at this stage as to whether reasonable medical personnel in Defendants' position would have considered their conduct consistent with protection of Plaintiff's rights.

*G. Conspiracy in Violation of the* Milburn *Modified Final Judgment*

In his Fifth Cause of Action (Sec.Am.Compl.¶¶ 47-48), Plaintiff alleges that Defendants violated the Modified Final Judgment by Consent, dated August 1, 1991, in *Milburn v. Coughlin,* No. 79 Civ. 5077(RCC) (S.D.N.Y.) (the "Modified Final Judg-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2403853 (S.D.N.Y.)
**(Cite as: 2004 WL 2403853 (S.D.N.Y.))**

ment"). *Milburn* was a class action brought on be-
half of "all persons who are or will be inmates at
Green Haven," and Plaintiff asserts that Defendants
have violated the Modified Final Judgment by con-
spiring to act with gross negligence and deliberate
indifference and depriving Plaintiff of his civil and
constitutional rights. As on the other counts of the
Complaint, Plaintiff seeks compensatory and punit-
ive damages as well as injunctive relief.

The Court has carefully reviewed the Modified
Final Judgment and concludes that Plaintiff's Fifth
Cause of Action must be dismissed without preju-
dice. The Modified Final Judgment contains numer-
ous provisions relating to medical care and condi-
tions of confinement at Green Haven. It includes
enforcement mechanisms that contemplate informal
resolution efforts and consultative procedures prior
to any contempt proceeding before the court, set
standards of proof, and provide for judicial enforce-
ment of the Modified Final Judgment by way of
motion practice in the *Milburn* case. *See* Modified
Final Judgment, § XXIX. Accordingly, Plaintiff's
claims relating to compliance with the Modified Fi-
nal Judgment are not properly asserted in this ac-
tion and will be dismissed without prejudice to re-
newal in the *Milburn* case in accordance with the
provisions of the Modified Final Judgment.

*H. Retaliation Claim Against Defendant Fila*

As noted above, Plaintiff has abandoned his
Eighth Amendment claim as against Defendant
Fila. Plaintiff argues, however, that the Complaint
should not be dismissed against her and that he
should be permitted to pursue a claim that Fila re-
taliated against him for filing grievances naming
her, by subjecting him to a baseless disciplinary
charge. This retaliation claim is not asserted in the
Second Amended Complaint or any other pleading
in this action. At this summary judgment stage, fol-
lowing the close of discovery, Plaintiff's attempt to
inject this claim into this case comes too late. Ac-
cordingly, the possibility that Plaintiff may have a
retaliation claim to assert against Defendant Fila
does not preclude dismissal of the claims Plaintiff

has asserted against her in this action. Summary
judgment will therefore be granted in Defendant
Fila's favor as to each of the causes of action asser-
ted in the Second Amended Complaint.

*I. Attorneys' Fees*

**\*15** Plaintiff has also requested the award of
reasonable attorneys' fees pursuant to 42 U.S.C.A.
§ 1988. This statute provides that courts may use
their discretion in awarding attorneys' fees to the
prevailing party of a lawsuit enforcing any of sever-
al provisions, including 42 U.S.C.A. §§ 1983, 1985,
and 1986. As Plaintiff has not yet prevailed on any
of his claims based on these provisions, he is not
entitled to an award of attorneys' fees.

### CONCLUSION

For the foregoing reasons, Defendants' motion
for summary judgment is granted as to Plaintiff's
Second, Third, Fourth and Fifth Causes of action as
to all remaining Defendants, and is also granted as
to Plaintiff's First Cause of Action insofar as claims
are asserted against Defendant Fila. As previously
noted, Plaintiff has withdrawn all of his claims
against Defendant Schwartzmann.

The parties shall promptly schedule a settle-
ment conference with Magistrate Judge Peck and, if
no settlement is concluded, counsel shall appear be-
fore the undersigned for a Final Pre-Trial Confer-
ence on December 10, 2004, at 2:30 p.m. Submis-
sions shall be made in advance of the conference in
accordance with the requirements detailed in the
Pre-Trial Scheduling Order entered in this case in
January 2003.

S.D.N.Y.,2004.
Scott v. Goord
Not Reported in F.Supp.2d, 2004 WL 2403853
(S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Edward C. FUNCHES Plaintiff,
v.
R. Reish (Warden), Mark Glover (Head Doctor),
McDonald (Med.Supervisor), and Tapia
(Asst.Supervisor) Defendants.

No. 97 CIV. 7611(LBS).
Oct. 5, 1998.

MEMORANDUM AND ORDER

SAND, District J.

*1 Plaintiff, Edward C. Funches, brings this *pro se* action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging civil rights violations against officials of the Manhattan Correctional Center ("MCC"). Plaintiff seeks $22,500,000.00 in damages for allegedly cruel and unusual punishment he received at the hands of Warden Rick M. Reish, Head Doctor Mark A. Glover, Medical Supervisor Kevin McDonald, and Physician's Assistant Tomas Tapia (collectively "Defendants").[FN1] Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. For the reasons explained below, the Motion is granted and the Complaint is dismissed. A portion of this dismissal shall be without prejudice, as set forth herein.

> FN1. The Complaint originally sought both injunctive and monetary relief. (*See* Compl. at 6-7.) The Plaintiff subsequently moved to strike the claim for injunctive relief. The Court granted this request by an Order dated June 2, 1998.

I. BACKGROUND

A. *Plaintiff's Claims*

Plaintiff Edward Funches is a twenty-seven year old wheelchair-bound paraplegic currently serving a sentence at the Federal Correctional Center in Beaumont, Texas. (*See* Def's Mem. at 1; Compl. at 4.) Plaintiff commenced this *pro se* action on October 15, 1997.[FN2] The suit arises from treatment Plaintiff allegedly received during three periods totaling approximately fourteen months of detention at MCC during 1996 and 1997 while awaiting trial in New York. The Complaint recites four claims alleging that Defendants subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (*See* Compl. at 4-6; Def's Mem. at 3-5.)[FN3]

> FN2. Because Plaintiff is proceeding *pro se,* the Court will liberally construe the allegations in the Complaint. *See Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997).

> FN3. The Complaint lists five claims but the fifth is a mere summary of Plaintiff's legal conclusion that Defendants violated his constitutional rights. (*See* Compl. at 5.)

Claim 1 alleges that while confined at MCC in early 1996, Defendant Glover failed to appreciate the severity of a sacral decubitus ulcer, or bedsore, that had formed on Plaintiff and ultimately required emergency surgery to treat. (*See* Compl. at 4 .) According to Mr. Funches, Defendants Glover, McDonald, and Tapia refused to provide materials for daily dressing of the wound or equipment required to prevent its deterioration. (*See id.* at 4-6; Funches Aff. at ¶¶ 22-23,[FN4] 27-28.) Claim 2, related to the first, alleges that Defendants Glover, McDonald, and Tapia failed to order medical supplies Plaintiff needed on a daily basis, such as single use urethral catheters, extension tubing, urinary leg bags, protective gloves, and lubricant jelly. (*See* Compl. at 4; Funches Aff. at ¶ 27.) The Complaint states that Plaintiff was forced to reuse these supplies repeatedly, sacrificing even the most elemental requirements of sanitariness. (*See* Compl. at 5;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attachment 5

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

Funches Aff. at ¶ 32.)

> FN4. Two paragraphs of Funches' Affidavit in Opposition to the Defendants' Motion for Summary Judgment are numbered "22" and two are numbered "23." The Court here refers to the second paragraph 22 and the second paragraph 23.

Claim 3 alleges that Plaintiff was subject to great embarrassment because he was forced to live with non-disabled inmates and perform his daily regimen of personal hygiene in front of them, a problem exacerbated by his incontinence and lack of bowel control. (*See* Compl. at 5.) Claim 4 alleges that Plaintiff was denied any opportunity to participate in outdoor recreation or to attend religious services because neither the recreation area nor the chapel is wheelchair accessible. (*See id.; Def's Mem.* at 4-5.) He further alleges that neither the weight room nor the laundry room is wheelchair accessible. (*See* Compl. at 5, Def's Mem. at 5.)

**B. *Review of Inmate Complaints***
**\*2** The Bureau of Prisons ("BOP") has established a four-step administrative procedure by which "inmates may seek formal review of an issue which relates to any aspect of their confinement ... if less formal procedures have not resolved the matter." 28 C.F.R. § 542.10 (1998). The four-step framework does not apply to claims, such as those sounding in tort, for which Congress has already established an alternative administrative procedure. *See id.* at §§ 542.10, 542.12. The regulations require that inmates first seek informal resolution of their complaints. *See id.* at § 542.13. If the complaint is not resolved informally, the prisoner may then submit a formal written request, on a designated form, to the facility's warden. *See id.* at § 542.14(a).

The deadline for completion of informal review or filing of a formal complaint is twenty days from the event giving rise to the grievance. *See id.* This time period may be extended "[w]here the inmate demonstrates a valid reason for delay." *See id.* at §

542.14(b). If an inmate's formal request is denied, the inmate has twenty days in which to appeal the decision to the appropriate BOP Regional Director, again using a particular form designated by BOP. *See id.* at § 542.15(a). Upon an adverse determination by the Regional Director, the inmate has thirty days in which to appeal to the BOP General Counsel. *See id.*

It is well settled that inmates may also bring tort suits against the United States under the Federal Tort Claims Act ("FTCA"), codified at 28 U.S.C.A. §§ 2671-2680 (West 1998). *See United States v. Muniz,* 374 U.S. 150, 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The FTCA waives the United States's sovereign immunity for suits alleging negligence by federal employees acting within the scope of their employment. *See* 28 U.S.C.A. § 1346(b)(1) (West 1998). The Act provides that the United States shall be liable on tort claims "in the same manner and to the same extent as a private individual under like circumstances." *Id.* at § 2674. Tort claims are not subject to the same four-part administrative review procedure discussed previously. *See* 28 C.F.R. §§ 542.10, 542.12, 543.30. The BOP has designated a special form for use in prisoner administrative tort claims. (*See, e.g.,* Stroble Dec. Exhibit D.)

**II. DISCUSSION**
In ruling on a motion for summary judgment, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is appropriate only when there is no genuine issue of material fact. *See Brown v. City of Oneonta,* 106 F.3d 1125, 1130 (2d Cir.1997) . This device is a "drastic procedural weapon because 'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.' " *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

*3 The Defendants urge numerous grounds for summary judgment. We consider each of these arguments below.

A. *Qualified Immunity*

The Supreme Court has explained that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For purposes of this test, "[a] right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alterations in original). In order to facilitate summary judgment on claims lacking merit, the *Harlow* test focuses on objective criteria rather than on the subjective state of mind of the official. *See Harlow,* 457 U.S. at 815-18. The Supreme Court has indicated that courts should resolve immunity defenses as early as possible in order to prevent officials from being subject to unnecessary litigation. *See Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Harlow,* 457 U.S. at 815-19.

1. *Claims 1 and 2*

Defendants argue that qualified immunity shields them from liability for Plaintiff's allegations of inadequate medical care as set forth in Claims 1 and 2 of the Complaint. (*See* Def's Mem. at 16.) It is well settled that deliberate indifference to the serious medical needs of prisoners violates those prisoners' constitutional rights. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Supreme Court has recently elaborated on the definition of "deliberate indifference" and explained that the test focuses on the subjective knowledge of the officer whose conduct is at issue:

We hold ... that a prison official cannot be

found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Under the *Farmer* standard, the central question-the defendant's knowledge regarding the risk of harm to the plaintiff-is normally a question of fact to be determined after trial. *See id.* at 842 ("Whether a prison official has the requisite knowledge of a substantial risk is a question of fact ...."); *Weyant v. Okst,* 101 F.3d 845, 856-57 (2d Cir.1996) . At summary judgment, we perform the following analysis. First, making all inferences in favor of Plaintiff, we determine the possible scope of Defendants' denial of medical care to Plaintiff. Second, we ask whether a rational jury could conclude that Defendants were unreasonable to believe that such a denial would not violate Plaintiff's rights. Only if every rational jury would find the Defendants' judgment to be reasonable can we grant Defendants' Motion for summary judgment. *See LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998).

*4 Plaintiff has set forth an evidentiary basis from which a trier of fact could conclude that Defendants Glover, McDonald, and Tapia repeatedly failed to clean and dress his bedsore on a daily basis and failed to provide him with necessary medical equipment despite their knowledge of his medical condition. (*See, e.g.,* Funches Aff. ¶¶ 22-23, FN8 28, 32-34.) Plaintiff has alleged that he was denied requested medical treatment from January 6 to January 23, 1996; from March 20 to March 25, 1996; from April 6 to April 16, 1997; and on November 14, 1997. (*See id.* at ¶ 6.) He has also alleged that he was denied use of an air mattress for approximately six weeks, despite instructions from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

a doctor terming the use of such a pressure-relieving mattress "necessary." (*See id.* at ¶¶ 26, 33; Pl's Opp. Exhibit A.)

> FN5. As per Footnote 4, *see supra,* the Court here refers to the four-paragraph span that runs from the first paragraph 22 to the second paragraph 23.

Defendants Glover, McDonald, and Tapia contend that even construing the evidence in the light most favorable to the Plaintiff, the claims of inadequate medical care still do not rise to the level of deliberate indifference. (*See* Def's Reply at 9-10.) We do not agree. Plaintiff has alleged that Defendants Glover, McDonald, and Tapia knew about a serious medical condition, repeatedly failed to offer necessary treatment for this condition, and that such condition ultimately worsened to the point that emergency surgery was required. Moreover, the Second Circuit has plainly stated that summary judgment is normally inappropriate to resolve the issue of a defendant's state of mind in the deliberate indifference context. *See Weyant,* 101 F.3d at 856. Given the *Weyant* Court's pronouncement and the evidence offered by the Plaintiff in this case, we cannot as a matter of law conclude that Defendants Glover, McDonald, and Tapia are entitled to a defense of qualified immunity from Plaintiff's claims of inadequate medical care.

We conclude, however, that Defendant Reish is entitled to the defense of qualified immunity to Plaintiff's medical care claims. Plaintiff has offered no evidence from which a finder of fact could conclude that Defendant Reish knew of and disregarded an excessive risk to Plaintiff's health and safety. *See Farmer,* 511 U.S. at 837. Plaintiff's sole factual allegation regarding the Warden's involvement in his medical treatment reads as follows:

That R. Reich [sic], Warden of M.C.C., New York, knew or should have known about the denial of my receiving inadequate medical care, where custom by his subordinates failure to provide medical care is widespread [sic] and he takes no steps to stop such denial of medical care where he has the authority and responsibilities to do so. *McCray v. Maryland,* 456 F.2d 1, 3 (4th Cir.1972).

(Funches Aff. at ¶ 8.) Plaintiff never specifically links Defendant Reish to any aspect of his medical care or offers facts indicating that Defendant Reish disregarded known risks to Plaintiff's health. Plaintiff offers no evidence that Defendant Reish participates in medical decision-making, is routinely informed of inmate's medical conditions, or was in fact informed of Plaintiff's condition in this case. This failure to connect Defendant Reish with Plaintiff's medical care in any way is fatal to Plaintiff's claim of deliberate indifference. *See, e.g., Vance v. Peters,* 97 F.3d 987, 992-94 (7th Cir.1996) (dismissing claim against warden for deliberate indifference to plaintiff's medical needs due to insufficient links between warden and plaintiff's medical care), *cert. denied,* 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993) (same).

**\*5** Accordingly, we grant summary judgment to Defendant Reish on Plaintiff's Claims 1 and 2 and dismiss those claims with prejudice. We deny summary judgment on those claims to Defendants Glover, McDonald, and Tapia

**2. Claim 4**

Defendants contend that they are entitled to qualified immunity from Plaintiff's claim that he was denied the opportunity for outdoor recreation at MCC. Like the inadequate medical care claim considered above, Plaintiff's allegations regarding inadequate recreational opportunities state a claim under the Eighth Amendment and the Defendants' conduct will be measured under the deliberate indifference standard. Plaintiff does not allege any involvement on the part of Defendants Glover, McDonald, and Tapia in the denial of outdoor recreational opportunities. The Court therefore concludes as a matter of law that these Defendants were not deliberately indifferent to Plaintiff's need for outdoor exercise.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

Plaintiff's allegations attempting to link Defendant Reish to the denial of outdoor recreation are more substantial, but we reach a similar result. Courts within this Circuit have previously determined that inmates are entitled to at least some opportunity for exercise. *See, e.g., Davidson v. Coughlin,* 968 F.Supp. 121, 135 (S.D.N.Y.1997). Neither the Supreme Court nor the Second Circuit have squarely held that outdoor recreation is required for all inmates in all contexts, however. It is undisputed that Plaintiff was housed at MCC only temporarily awaiting trial and that the only outdoor recreation facilities at MCC are on the building's roof, a location not accessible to wheelchairs. (*See* Rosalez Dec. at ¶ 4; Def's Mem. at 2-10; Funches Aff. at ¶¶ 38-39.) Plaintiff thus asks this Court to conclude that during detention at MCC, there existed a clearly established constitutional right to outdoor exercise for all post-conviction inmates regardless of the duration of their confinement, the extent of any disabilities, or the feasibility of providing such access. We do not believe any such right was clearly established. Accordingly, we conclude as a matter of law that Warden Reish is protected by qualified immunity from liability for any decisions limiting Plaintiff's access to outdoor recreation.

Reading Plaintiff's claims liberally, however, we believe he may intend to claim that Defendant Reish denied him access to all recreation, not simply outdoor recreation, in violation of a clearly established right. We may grant Defendant Reish summary judgment on this claim only if we conclude as a matter of law that he was not deliberately indifferent to Plaintiff's need for some recreation.

Plaintiff's housing unit at MCC contained an indoor weight room that is wheelchair accessible.(*See* Rosalez Dec. at ¶ 2.) Plaintiff acknowledges the existence of this facility and apparently concedes that it is wheelchair accessible but avers that the size and positioning of its equipment rendered it de facto inaccessible to him. (*See* Funches Aff. at ¶ 40.) Plaintiff bears a heavy burden in establishing

deliberate indifference in this context because Warden Reish is shielded from liability if he reasonably believed that he had provided Plaintiff with access to indoor recreational opportunities. To state a claim, Plaintiff must offer evidence indicating that Defendant Reish knew of and disregarded the room's de facto unavailability to wheelchair bound inmates. *See Farmer,* 511 U.S. at 837. The record contains no evidence that Plaintiff or any other inmate informed Warden Reish of the room's poor layout, that Warden Reish was aware of the problematic equipment organization, or that Warden Reish was in any way directly responsible for overseeing the weight room. Therefore, Warden Reish is entitled to the defense of qualified immunity on this claim.

*\*6 Accordingly, we grant Defendants' Motion for summary judgment on the portion of Plaintiff's Claim 4 alleging constitutional violations from inadequate recreational opportunities and dismiss that claim with prejudice.

B. *Rehabilitation Act*
Defendants next argue that Plaintiff should not be allowed to assert a *Bivens* claim based on his exclusion from religious services (Claim 4) without first exhausting administrative remedies as required by the Rehabilitation Act. We agree. Section 794 of Title 29 of the United States Code provides recovery under the Rehabilitation Act for federal prisoners claiming that they have been denied equal access to programs solely because of disabilities. *See* 29 U.S.C.A. § 794(a) (West 1998). Pursuant to this Section, the Department of Justice has promulgated regulations that establish an administrative procedure to address "all allegations of discrimination on the basis of handicap in programs or activities conducted by the agency." 28 C.F.R. § 39.170(a) (1998). The regulations require inmates to exhaust the four-step BOP framework discussed previously before initiating suit. *See id.* at § 39.170(d)(1)(ii). Because Plaintiff has failed to exhaust these remedies with respect to his claim of exclusion from religious services, we have no choice but to dismiss his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

claim. *See, e.g., Crowder v. True,* No. 91 C 7427, 1993 WL 532455, at *5-6 (N.D.Ill.Dec.21, 1993), *reconsideration granted in part on other grounds,* 845 F.Supp. 1250 (N.D.Ill.1194), *aff'd,* 74 F.3d 812 (7th Cir.1996).

Accordingly, we grant Defendants' Motion for summary judgment on that portion of Plaintiff's Claim 4 alleging constitutional violations as a result of exclusion from religious services.[FN6] That claim is dismissed without prejudice to the filing by Plaintiff of a new action if and when he exhausts his administrative remedies. We express no opinion on whether the BOP should find that Plaintiff has a "valid reason for delay" sufficient to excuse his failure to seek administrative review within twenty days of the events precipitating the present action. 28 C.F.R. § 542.14(b) (1998).

> FN6. Although we have previously dismissed that portion of Plaintiff's Claim 4 dealing with access to outdoor recreation on the ground of qualified immunity, we note as an alternative holding that, because those claims are also governed by the Rehabilitation Act, they are likewise subject to dismissal for failure to exhaust administrative remedies as required by 28 C.F.R. § 39.170(d)(1)(ii).

C. *Failure to Allege a Constitutional Violation in Claim 3*
Defendants argue that Claim 3 must be dismissed because Plaintiff has not alleged any constitutional violation in being housed with non-disabled inmates. Even reading Plaintiff's claim broadly, we cannot discern a claim of constitutional import. Plaintiff merely alleges that he was subject to great embarrassment by virtue of his numerous medical problems and other inmates' propensity to ridicule him. (*See* Compl. at 5.) Yet Plaintiff was housed in a wheelchair accessible housing unit and he points to no authority indicating that prison officials had an obligation to create a dedicated disabled-inmate wing. (*See* Def's Mem. at 21 ("Inmates 'have no constitutional right to be housed

in any particular prison or housing unit." (quoting *Garrett v. Angelone,* 940 F.Supp. 933, 942 (W.D.Va.1996), *aff'd,* 107 F.3d 865 (4th Cir.1997) )).)

*7 In addition, Plaintiff fails to connect Defendants to the purported constitutional violation. Plaintiff does not mention Defendants Glover, McDonald, and Tapia in the portion of his papers addressing the housing claim, (*see* Funches Aff. at ¶¶ 37-43), and his allegations regarding Defendant Reish do little more than allege that, as Warden, Defendant Reish had an obligation to insure that Plaintiff's constitutional rights were not violated. In sum, Plaintiff has failed to state a claim on which relief may be granted because he does not point to a recognized constitutional right that has been violated nor does he explain how any of the Defendants violated that right.

Accordingly, we grant Defendants' Motion for summary judgment on Plaintiff's Claim 3 and dismiss that claim with prejudice.

D. *Exhaustion Under the Prison Litigation Reform Act*
The foregoing serves to dismiss the Complaint as to Defendant Reish on all counts and as to Defendants Glover, McDonald, and Tapia as to Claims 3 and 4. Because we concluded above that Defendants Glover, McDonald, and Tapia were not entitled to qualified immunity on Plaintiff's medical care claims (Claims 1 and 2), we must now consider Defendants' final argument: that Plaintiff has failed to exhaust available administrative remedies before bringing suit. Congress has provided that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a) (West 1998) (as amended by the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996)). Here, Plaintiff did not utilize any portion of the BOP's four-part administrative review procedure to address his al-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
(Cite as: 1998 WL 695904 (S.D.N.Y.))

legedly inferior medical treatment.

Citing § 1997e, Defendants argue that the Court should dismiss these claims for failure to exhaust administrative remedies. (*See* Def's Mem. at 13-16.) Plaintiff argues that because he seeks only monetary damages and the Bureau of Prisons lacks authority to award such damages, the Court should not dismiss for failure to exhaust. (*See* Funches Aff. at ¶ 20.) This Court must therefore determine whether Congress intended to require a prisoner seeking only monetary damages in a *Bivens* action to exhaust the BOP's administrative review procedures even though such procedures do not offer the type of relief sought.

There is no consensus among the courts that have considered this question previously. *Compare Garrett v. Hawk,* 127 F.3d 1263, 1267 (10th Cir.1997) (finding the PLRA's exhaustion requirement inapplicable for *Bivens* actions seeking only monetary damages), *Hollimon v. DeTella,* 6 F.Supp.2d 968, 970 (N.D.Ill.1998) (same), *Polite v. Barbarin,* No. 96 Civ. 6818, 1998 WL 146687, at *2 (S.D.N.Y. March 25, 1998) (same), *and Russo v. Palmer,* 990 F.Supp. 1047, 1050 (N.D.Ill.1998) (same), *with Moore v. Smith,* 18 F.Supp.2d 1360, 1998 WL 559075, at *3 (N.D.Ga. Aug.28, 1998) (dismissing due to lack of exhaustion even though the plaintiff sought only monetary damages), *Bearden v. Godfrey,* No. C98-2294, slip op., 1998 WL 456294, at *1 (N.D.Cal. July 27, 1998) (same), *Melo v. Combes,* 97 Civ. 0204, 1998 WL 67667, at *3 (S.D.N.Y. Feb 18, 1998) (same); *Spence v. Mendoza,* 993 F.Supp. 785, 787-88 (E.D.Cal.1998) (same), *and Gibbs v. Bureau of Prison Office,* 986 F.Supp. 941, 944 (D.Md.1997) (same). For the reasons explained below, we join those courts that have concluded that the PLRA's exhaustion requirement applies to *Bivens* claims seeking only monetary damages.

*8 Prior to the passage of the PLRA, § 1997e granted district courts discretionary authority to dismiss 42 U.S.C. § 1983 cases for which the plaintiff had failed to exhaust "such plain, speedy,

and effective administrative remedies as are available." 42 U.S.C.A. § 1997e(a)(1) (West 1996) (subsequently amended). The PLRA expanded § 1997e's coverage beyond § 1983 suits to actions under any federal law, removed discretion from district judges regarding whether to dismiss unexhausted claims, and amended § 1997e's exhaustion requirement by omitting the words "plain, speedy, and effective." 42 U.S.C.A. § 1997(e)(a) (West 1998).

In *McCarthy v. Madigan,* 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), a pre-PLRA case, the Supreme Court considered a district court decision to dismiss a prisoner's *Bivens* claim for monetary damages on the ground that the prisoner had not exhausted his administrative remedies. In reversing, the Court first distinguished between statutory and judicial exhaustion: "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *Id.* at 144 (citations omitted); *accord Bastek v. Federal Crop Insurance Corp.,* 145 F.3d 90, 94 (2d Cir.1998) (requiring exhaustion when "[f]aced with unambiguous statutory language"). Finding that "Congress has not meaningfully addressed the appropriateness of requiring exhaustion" in *Bivens* suits, *McCarthy,* 503 U.S. at 149, the majority used a balancing of interests analysis to determine whether the case could go forward. *See id.* at 146; *see also Bastek,* 145 F.3d at 94 ("Only in the absence of an explicit statutory exhaustion requirement may courts exercise discretion ....").

The Court noted that by its terms, § 1997e applied only to § 1983 suits, not *Bivens* actions. *See McCarthy,* 503 U.S. at 150. The Court also explained that § 1997e did not require dismissal of unexhausted claims but rather vested ample discretion with district court judges, and stated that Congress explicitly conditioned the exhaustion requirement on the availability of "effective administrative remedies." *Id.* at 150; *see also id.* at 156 (Rehnquist, C.J., concurring in the judgment)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

(stating that the BOP's administrative remedy "furnishes no *effective* remedy at all" to one seeking money damages) (emphasis added). Although the Court found that the absence of monetary relief in the BOP administrative grievance procedure counseled strongly against invocation of judicially-imposed exhaustion, the Court did not consider the unavailability of monetary relief to be dispositive. *See id.* at 154.

The post-PLRA version of § 1997e is substantially different from the one considered by the Supreme Court in *McCarthy.* Section 1997e has been expanded to apply to actions brought under any federal law, *see Garrett v. Hawk,* 127 F.3d 1263, 1265 (10th Cir.1997); the statute now mandates dismissal of unexhausted claims, *see Brown v. Toombs,* 139 F.3d 1102, 1103-04 (6th Cir.1998) (per curiam); and the amended version of § 1997e makes no mention of the efficacy of a given administrative remedy, *see Spence v. Mendoza,* 993 F.Supp. 785, 787 (E.D.Cal.1998). *See Moore v. Smith,* 18 F.Supp.2d 1360, 1998 WL 559075, at *2 (N.D.Ga. Aug.28, 1998). The nature of these amendments indicates that Congress intended to close the gaps discussed by the *McCarthy* Court and to impose a broad regime of statutorily-required exhaustion to all claims brought by federal prisoners. Furthermore, if deletion of the word "effective" is to be given any weight, we must assume that Congress intended to condition "prisoner suits on the exhaustion of such administrative remedies as are available, without regard to whether those remedies are 'effective.' " *Spence,* 993 F.Supp. at 787; *accord Moore,* 1998 WL 559075, at *3. Accordingly, we believe that the text of § 1997e, as amended by the PLRA, requires exhaustion in cases such as this one.

*9 Moreover, we believe it is a mistake to read § 1997e's exhaustion requirement to depend on the type of relief sought by the prisoner. If an inmate may avoid administrative review procedures simply by limiting the complaint to a request for monetary damages, Congress's intent in creating a broad exhaustion requirement in § 1997e will be thwarted. [FN7] *See Moore,* 1998 WL 559075, at *4 In addition, strict adherence to PLRA's rule of exhaustion should ultimately lead to improved prison conditions and swifter responses to grievances because inmates will be forced to bring their claims to the attention of prison officials promptly or risk forfeiture of a subsequent *Bivens* action. *See* 28 C.F.R. § 542.14(a) (1998). The rule established in *Garrett* and its progeny does not induce inmates to seek prompt remediation, for monetary damages remain available even if the administrative deadlines lapse. Such a system reduces the opportunity for BOP to engage in creative problem-solving and increases the burden on federal courts as prisoners bypass administrative review procedures and opt for money damage suits in federal courts. We do not believe that these results are consonant with Congress's intent in passing the PLRA.

> FN7. In the instant case, Plaintiff originally sought both injunctive and monetary relief, (*see* Compl. at 6-7), but subsequently withdrew his claim for injunctive remedies. Apparently, Plaintiff was cognizant of the safe-harbor provided by cases such as *Garrett v. Hawk* that have refused to find exhaustion where a prisoner requested only money damages. (*See* Funches Aff. at ¶ 20 (citing *Garrett,* 127 F.3d at 1265-67)). As this case highlights, § 1997e will have an extremely limited impact if prisoners can avoid dismissal of unexhausted *Bivens* claims merely by seeking monetary relief.

Accordingly, we find that the PLRA's exhaustion requirement applies to *Bivens* actions seeking only monetary relief. Because Plaintiff has failed to exhaust available BOP administrative remedies before bringing suit against these officials, we grant summary judgment to Defendants Glover, McDonald, and Tapia dismissing Plaintiff's remaining claims.[FN8] This dismissal of Claims 1 and 2 shall be without prejudice to the filing by Plaintiff of a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

new action if and when he exhausts his administrative remedies under the BOP four-step framework. We express no opinion on whether the BOP should find that Plaintiff has a "valid reason for delay" sufficient to excuse his failure to seek administrative review within twenty days of the events precipitating the present action. 28 C.F.R. § 542.14(b) (1998) .

> FN8. Although we have previously dismissed Claims 3 and 4 as to all Defendants on alternative grounds, it bears noting that Plaintiff failed to avail himself of the BOP administrative review procedure for those grievances as well. Plaintiff never complained about his housing situation or challenged his access to religious services, the weight room, and the laundry room. (*See* Def's Mem. at 14.) Plaintiff did request that MCC Recreation Supervisor, Arthur Kumm, provide access to the roof-top recreation facilities. (*See* Stroble Dec. at ¶ 3.) This request was denied eight days later, (*see id.* at ¶ 4), and Plaintiff did not appeal the decision. (*See* Def's Mem. at 14.) Thus, insofar as we dismiss Claims 1 and 2 against the remaining Defendants for failure to exhaust, we note that the other claims in this action could be dismissed on similar grounds.

*E. Federal Tort Claims Act*

Like the PLRA, the FTCA requires that claimants first exhaust administrative remedies before bringing suit against the United States in federal court. *See* 28 U.S.C. § 2675(a) (West 1998); *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Tort claims are not governed by the BOP four-part framework discussed previously. *See* 28 C.F.R. §§ 542.10, 542.12 , 543.30 (1998). The only action an inmate must take prior to filing an FTCA suit in federal court is to submit an Administrative Tort Claim to the appropriate BOP Regional Office. *See id.* at § 543.31(b). Denial of that claim constitutes "final

administrative action." *Id.* at § 543.31(f).

We believe that Plaintiff has exhausted the administrative remedies required before initiating an FTCA suit against the United States on one claim: the nature of the medical care he received at MCC. On November 12, 1996, Plaintiff submitted an Administrative Tort Claim to the BOP's Northeast Regional Office asserting injuries as a result of his medical treatment. (*See* Compl. at 2; Stroble Dec. at ¶ 7.) This tort claim was denied on April 21, 1997, ( *see* Compl. at 2; Stroble Dec. at ¶ 8 & Exhibit E), and the BOP informed Plaintiff that he could bring suit " *against the United States* in an appropriate United States District Court within six (6) months," (Stroble Dec. Exhibit E (emphasis added).) Plaintiff filed this suit on October 15, 1997, but did not name the United States as a party or articulate a cause of action under the FTCA. [FN9] Moreover, in the papers filed with this Court, neither Plaintiff nor Defendants briefed the issue of the United States's tort liability.

> FN9. We believe Plaintiff may have mistakenly read the BOP's comment on filing an FTCA claim against the United States in Federal District Court as an invitation to file this *Bivens* suit. We grant leave to amend, as set forth below, because we do not believe that Plaintiff should be prejudiced by such a misunderstanding with the consequence that a subsequent FTCA action would be time-barred.

**\*10** Accordingly, we grant Plaintiff ninety days to amend his Complaint to allege a claim against the United States under the Federal Tort Claims Act. The tort claim should be limited to the question of Plaintiff's medical treatment and, absent special circumstances detailed by statute, seek no more in damages than Plaintiff requested in his administrative tort claim. *See* 28 U.S . C.A. § 2675(a)-(b).

CONCLUSION

For the foregoing reasons, the Defendants' Mo-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)
**(Cite as: 1998 WL 695904 (S.D.N.Y.))**

tion is granted and the Complaint is dismissed in its entirety. This dismissal shall be without prejudice to the filing by Plaintiff of (1) an Amended Complaint, within ninety days of the issuance of this Memorandum and Order, on the issue of the United States's tort liability for his allegedly deficient medical care while detained at MCC; (2) a new action against any of the Defendants on his claim of inadequate access to religious services if and when he exhausts available administrative remedies; (3) a new action against Defendants Glover, McDonald, and Tapia on the issue of his medical care while detained at MCC if and when he exhausts available administrative remedies. In all other respects this dismissal shall be with prejudice.

SO ORDERED.

S.D.N.Y.,1998.
Funches v. Reish
Not Reported in F.Supp.2d, 1998 WL 695904 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.